IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRADLEY CHARLES PRICE,           )
                                 )      Civil No. 06-1665-MO
          Petitioner,            )
                                 )
     v.                          )
                                 )
MARK NOOTH,                      )
                                 )      OPINION AND ORDER
          Respondent.            )

     Francesca Freccero
     Assistant Federal Public Defender
     101 S.W. Main Street, Suite 1700
     Portland, Oregon 97204

          Attorney for Petitioner

     John R. Kroger
     Attorney General
     Jacqueline Sadker
     Assistant Attorney General
     Department of Justice
     1162 Court Street NE
     Salem, Oregon 97310

          Attorneys for Respondent

///

     1 - OPINION AND ORDER

MOSMAN, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 in which he seeks to challenge the legality of his underlying state convictions for Aggravated Murder.  For the reasons which follow, the Corrected Amended Petition for Writ of Habeas Corpus (#37) is denied.

## BACKGROUND

On July 14, 1997, Frank Nimz and Gabriella Goza were found dead on the beach at Seaside.  Both had died of gunshot wounds inflicted by Jesse McAllister, who was accompanied by petitioner. At petitioner's resulting bench trial, the key issue involved the level of petitioner's participation in the murders and whether that participation would support a conviction for Aggravated Murder under the theory that he aided and abetted McAllister.

Petitioner first met Jesse McAllister in February of 1996. Trial Transcript, p. 1248.  The two became friends and, beginning in June 1996, they began sharing an apartment.  *Id* at 1255. According to petitioner, McAllister's "personality was really violent and [he was] not terribly conscious of the world around him."  *Id* at 1253.  McAllister had been in several fights in petitioner's presence, had told petitioner and others that he wanted to be a hitman, and had harbored a desire to kill another person for about two years.  *Id* at 675, 1070, 1257, 1280.

McAllister had been looking to purchase a handgun for "quite a while," but was not eligible to do so because he was under 21 years of age and had a felony conviction for Burglary in the First Degree on his record. *Id* at 1282, 674. According to McAllister, he wanted to purchase the gun so he could "[k]ill somebody." *Id* at 674. He was sure that he told petitioner of his intentions. *Id* at 675.

Approximately one or two weeks prior to the murders, petitioner purchased a Calico 9mm "street sweeper" handgun with a 50-round magazine. *Id* at 615, 677, 1312-13, 1318. According to the seller, "words were said that it was clearly [petitioner's] gun. [McAllister] could not own a gun because he was on probation or something." *Id* at 615. The seller was "sure" that petitioner handed him the money for the firearm, and had no reason throughout the transaction to believe that petitioner and McAllister were anything other than partners. *Id* at 618-19. The sale to petitioner was, of course, a sham intended to allow McAllister to obtain a firearm.

On July 11, 1997, McAllister asked petitioner to purchase ammunition for the firearm, and petitioner did so. *Id* at 1278. The two then took the gun to a local cemetery to test fire it. *Id* at 1279. Petitioner fired the weapon twice. *Id.*

In the early morning hours of July 14, 1997, petitioner and McAllister went to several bars in seaside until they closed at

3 - OPINION AND ORDER

approximately 2:00 a.m. *Id* at 1288. They returned to their apartment but soon became bored. Petitioner testified that McAllister then told him that he "wanted to look for someone to kill," prompting the pair to set out for Del Ray Beach. *Id* at 1283. Petitioner also testified that when they set out for the beach, he was aware that McAllister took a backpack with him containing the loaded firearm. *Id* at 1324.

The two men found Del Ray Beach to be deserted, and drove back to the beach at Seaside. *Id* at 1285. At about 4:00 a.m., they came upon three vacationers at a bonfire, Carianne Barkie, Amy Eckroth, and Kevin Westrick (hereinafter collectively referred to as the "Bonfire Group"). *Id* at 277, 280. Using assumed names, petitioner and McAllister spoke with the Bonfire Group for about half an hour when, according to Barkie, McAllister "started bringing up a conversation that sounded like it had started prior to stopping at our campfire about a 'notion.'" *Id* at 291, 294. Petitioner testified that he knew McAllister's reference to his "notion" meant that "he was still thinking about killing someone." *Id* at 1345. In response to McAllister's inquiry about his "notion," petitioner initially just shrugged his shoulders. *Id* at 295.

When Barkie asked what "notion" he was talking about, McAllister responded that she would find out as soon as he finished his cigarette. *Id.* The tone of McAllister's voice frightened

Barkie.  *Id.*  Price asked McAllister if he wanted to go to a liquor store or back to the apartment for more alcohol, and McAllister declined.  *Id* at 295-96.

McAllister continued to ask petitioner what he thought about the "notion," and petitioner said he was "taking precautions."  *Id* at 298-99.  McAllister responded, "what precautions are there to take?  It's perfect.  There's no one around, it's dark, there's no one on the beach . . . so what precautions are there to take?"  *Id* at 299.  Petitioner responded that they were too close to Seaside's promenade.  *Id.*

McAllister again protested to petitioner that the beach was deserted.  *Id* at 301.  When Barkie tried to ask again what the two were talking about, McAllister, in a violent tone said, "I'll tell you when I'm done with my cigarette."  *Id.*  At that point, petitioner got up and positioned himself behind the only male member of the Bonfire Group.  *Id* at 303.

McAllister next asked petitioner, "[A]re you scared?  You're scared, aren't you . . . or is it that there's two -- only two of us and three of them?"  *Id* at 305.  Petitioner did not respond, and Barkie had the impression that McAllister was challenging petitioner.  *Id.*  McAllister told the Bonfire Group that they did not need to worry about being robbed, a comment which only served to elevate their fears about the encounter.  *Id* at 306.

At that point, the Bonfire Group rose to leave, and petitioner "stood up and kind of pointed like we were -- you know, they're leaving. . . ." *Id* at 307. The gesture was intended for McAllister. *Id* at 307-08. McAllister then said to petitioner, "you'd better make your decision quickly." *Id* at 308. Immediately thereafter, McAllister picked up his backpack (containing the firearm) and put his hand in it. *Id*. Petitioner did not say anything in response. *Id* at 309. As the Bonfire Group was leaving the scene, McAllister said to petitioner, "I'm very disappointed in you." *Id*. Barkie did not hear any response because she and her companions were running away. *Id* at 310.

At no time did Barkie ever hear petitioner "say anything to the effect of don't do this, we don't need to do anything like this, leave these people alone, anything like that[.]" *Id*. The last the Bonfire Group saw of McAllister and petitioner, they were walking toward the Seaside Turnaround. *Id* at 311.

Petitioner and McAllister headed toward home and encountered Nimz and Goza sitting along the promenade. *Id* at 708. Nimz asked whether petitioner or McAllister had any marijuana, and McAllister answered in the negative. *Id* at 709. Nimz thought the pair was holding out, and told them not to be "stingy." *Id*. At this point, McAllister asked petitioner if "he wanted to smoke a bowl[.]" *Id*. Since McAllister and petitioner did not use drugs, he was really asking whether petitioner "wanted to go ahead and kill these

6 - OPINION AND ORDER

people."    *Id* at 710.    McAllister testified that petitioner responded in the affirmative, even though petitioner (per his own testimony) knew the pair did not have any marijuana and believed this to be a ruse to lure the victims down to the beach.    *Id* at 710, 1356.    Petitioner testified that he knew that McAllister intended to murder Nimz and Goza from the moment he offered marijuana to them.    *Id* at 1358.    This knowledge did not stop petitioner from helping McAllister to isolate the victims.

At some point as they continued walking down the beach, Nimz asked petitioner if McAllister really had any marijuana, and petitioner responded in the negative.    *Id* at 1363.    This prompted everyone to stop walking, and when Nimz refused to go any further, McAllister pulled his gun out.    *Id* at 1265.    Nimz asked if the gun was real, and petitioner responded in the affirmative.    *Id* at 1267. Goza then charged at McAllister, and the gun went off.    Goza believed she had been shot and fell to the ground.    *Id.* McAllister stepped over her and, after clearing a jam, shot and killed Nimz. *Id* at 1267-68.    He was not concerned that Goza would get up and run away, because, even though there was no specific plan, he "figured [petitioner] would back [him] up if she tried to go anywhere."    *Id* at 718.    Petitioner was still leaning over Goza after Nimz was killed,[1] and McAllister nudged him out of the way with his elbow

---

[1]    The trial judge determined that petitioner prevented Goza from getting away while McAllister cleared the jam in his weapon and killed Nimz.    Trial Transcript, p. 1589.    Although petitioner

and shot Goza in the head. *Id* at 719. Petitioner having just seen McAllister murder two people for absolutely no reason, simply claimed, "'Mexico doesn't sound bad this time of year.'" *Id* at 721. Petitioner testified that fleeing to Mexico was his idea, and "the first thing to come into [his] mind. . . ." *Id* at 1269.

The two men fled to Mexico. Along the way, petitioner told McAllister that he should probably discard the weapon, and they tossed it into a ravine from a bridge in Redding, California. *Id* at 741. The two were ultimately apprehended, and McAllister pled guilty to two counts of Aggravated Murder.

The Clatsop County Grand Jury indicted petitioner on two counts of Aggravated Murder, and petitioner proceeded to a bench trial. Respondent's Exhibit 102; Respondent's Exhibit 124, p. 20. The court convicted petitioner of two counts of Aggravated Murder for aiding and abetting the victims' murder and sentenced him to life in prison with a 30-year minimum. Respondent's Exhibit 101, Trial Transcript, pp. 1863-64.

Petitioner took a direct appeal, but the Oregon Court of Appeals affirmed the trial court without opinion, and the Oregon Supreme Court denied review. *State v. Price*, 174 Or.App. 565, 27 P.3d 535, *rev. denied*, 333 Or. 162, 39 P.3d 192 (2001).

---

takes issue with this finding, the court need not resolve the dispute over this finding in order to reach its conclusion in this case.

8 - OPINION AND ORDER

Petitioner next filed for post-conviction relief ("PCR") in Malheur County where the PCR trial court denied relief. Respondent's Exhibit 131. The Oregon Court of Appeals affirmed the lower court without opinion, and the Oregon Supreme Court denied review. *Price v. Hill*, 205 Or. App. 568, 135 P.3d 859, *rev. denied*, 341 Or. 449, 143 P.3d 772 (2006).

Petitioner filed his Corrected Amended Petition for Writ of Habeas Corpus on May 27, 2008 in which he raises the following claims:

1.  Petitioner was denied due process of law under the Fourteenth Amendment when he was convicted of Aggravated Murder on the basis of insufficient evidence; and

2.  Petitioner was denied his Sixth Amendment right to the effective assistance of trial counsel when counsel failed to introduce important evidence tending to show petitioner's lack of intent to aid and abet murder.

Respondent asks the court to deny relief on the Amended Petition because: (1) Ground One was not fairly presented to Oregon's state courts and is now procedurally defaulted; and (2) all of petitioner's claims lack merit.

<u>**DISCUSSION**</u>

I.  <u>**Exhaustion and Procedural Default**</u>.

A habeas petitioner must exhaust his claims by fairly presenting them to the state's highest court, either through a direct appeal or collateral proceedings, before a federal court will consider the merits of those claims. *Rose v. Lundy*, 455 U.S.

9 - OPINION AND ORDER

509, 519 (1982).  "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'"  *Casey v. Moore,* 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, (1986)).  If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, the claims have not been fairly presented to the state courts and are therefore not eligible for federal habeas corpus review.  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

A petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or failed to raise the claim at the state level at all.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  If a petitioner has procedurally defaulted a claim in state court, a federal court will not review the claim unless the petitioner shows "cause and prejudice" for the failure to present the constitutional issue to the state court, or makes a colorable showing of actual innocence.  *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Sawyer v. Whitley*, 505 U.S. 333, 337 (1992); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

In this case, respondent argues that petitioner failed to fairly present his Ground One claim to Oregon's appellate courts. A review of the record reveals that petitioner's Appellant's Brief argued that the trial court erred when it denied his motion for judgment of acquittal because the evidence was insufficient to establish that he assisted McAllister in the murders described above.  Respondent's Exhibit 103.  In doing so, petitioner did not base his claim on any federal constitutional provision, and did not cite to a single federal case.  *Id.*  "The law of [the Ninth Circuit] is plainly that a federal claim has not been exhausted in state court unless petitioner both raised the claim in state court and explicitly indicated then that the claim was a *federal* one. . . ." *Lyons v. Crawford,* 232 F.3d 666, 669 (9th Cir. 2000) (emphasis in original); *see also Reese v. Baldwin*, 541 U.S. 27, 32 (2004) (requiring a litigant to indicate the federal nature of his claim at each level of his state court proceedings).

Because petitioner failed to fairly present the federal nature of his due process claim to Oregon's state courts, and as the time for doing so passed long ago, the court finds that petitioner procedurally defaulted this claim.  Petitioner neither demonstrates cause and prejudice, nor makes a colorable showing of actual innocence sufficient to excuse the default.  Even if petitioner had not defaulted this claim, he would nevertheless not be entitled to relief.  As discussed below, the State offered ample evidence at

11 - OPINION AND ORDER

trial to convict him of Aggravated Murder under an aiding and abetting theory.

**II.  The Merits.**

    **A.  Standard of Review.**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413.  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410.  The state court's application of clearly established law must be objectively unreasonable.  *Id* at 409.

When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law.  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such an instance, although the court independently reviews the record, it still lends deference to the state court's ultimate decision.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

In this case, the PCR trial court did issue written findings containing rationale supporting the decision.  Respondent's Exhibit 131.  Although not obligated to do so, the court has nevertheless conducted an independent review of the record to determine whether the PCR trial court unreasonably applied clearly established federal law to petitioner's case.

    B.  **Analysis**.

Petitioner asserts that the performance of trial counsel was constitutionally deficient because: (1) counsel should have called Ana Bernal Dominguez, a girl whom petitioner befriended while on the run in Mexico, because she could have offered testimony

regarding petitioner's prior consistent statements concerning how the events of July 14, 1997 unfolded; (2) counsel failed to adequately prepare witness Paola Diaz Cruz who could have testified that McAllister was sincere in his assertion that petitioner did not assist with the killings; and (3) counsel should have elicited testimony from other witnesses showing that McAllister consistently maintained that petitioner did not participate in the murders, and testimony which showed petitioner's history as a peacemaker during McAllister's many violent interactions with people.

The Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel. First, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-687 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, the petitioner must show that his lawyer's performance prejudiced the defense. The appropriate test for prejudice is whether the defendant can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696.

14 - OPINION AND ORDER

Even assuming counsel should have done everything petitioner advocates, none of those things would have made any difference in his trial. *See Villafuerte v. Stewart*, 111 F.3d 616, 630 (9th Cir. 1997), *cert. denied*, 522 U.S. 1079 (1998) (a court may properly address the prejudice prong of *Strickland* first, without considering whether counsel's conduct was deficient). Petitioner was charged with Aggravated Murder under the theory that he aided and abetted McAllister in the commission of the murders. *See* ORS 161.155. As demonstrated by the Background of this Opinion, there was ample evidence to support this theory.

It is uncontroverted that petitioner knew of McAllister's: (1) history of violent encounters with people; (2) desire to murder someone; and (3) inability to purchase a firearm since he was under 21 years of age and a felon. Nevertheless, petitioner purchased a firearm for McAllister's use, and then proceeded to purchase the ammunition for him as well. This, alone, could constitute aiding and abetting, but petitioner did much more.

When McAllister suggested he and petitioner travel to the beach to look for someone to kill, petitioner went along even when he knew McAllister was carrying his newly-acquired firearm. At this point, there could be little doubt what McAllister intended, but petitioner made no effort to distance himself from the venture.

From the beginning of their interaction with the Bonfire Group, petitioner and McAllister provided false names. Under the

15 – OPINION AND ORDER

totality of the facts of this case, it is quite reasonable to assume they did so in order to conceal their identities based on their expectation that they would engage in criminal conduct.  When McAllister asked petitioner, in code, whether he should kill the Bonfire Group, petitioner indicated that they were too close to the promenade, *i.e.*, that they were in too public a place to get away with murdering these people.

McAllister continued to ponder murdering the Bonfire Group, and petitioner went so far as to draw McAllister's attention to fact that the Bonfire Group was attempting to leave.  It is hard to imagine why petitioner would do such a thing if, in fact, he was opposed to McAllister's deadly "notion."  Thereafter, McAllister again sought petitioner's assent while reaching for the firearm in his backpack telling him, "you'd better make your decision quickly."  Trial Transcript, p. 308.  Petitioner simply remained silent and, fortunately, the Bonfire Group was able to escape unharmed.

By this time, there was absolutely no doubt what McAllister intended to do.  Nevertheless, petitioner did not attempt to dissuade him from violence, and also failed to make any attempt to separate from him.  Instead, petitioner led the victims to their deaths by telling McAllister that they should all go smoke marijuana together, even though he knew McAllister didn't use drugs and did not have any marijuana.  As McAllister testified, his

16 - OPINION AND ORDER

reference to marijuana was intended as a signal as to whether petitioner wished to proceed with killing Nimz and Goza. Petitioner, himself, testified that he knew what McAllister was asking. Petitioner could have told McAllister to stop what he was doing. He also could have indicated that he did not want anything to do with a violent encounter. He could have separated from McAllister and called the police. He could have warned the victims while they were on the promenade. He could have simply said he didn't want to smoke the non-existent marijuana. But he didn't. And when he saw McAllister shoot two people in cold blood, his reaction showed absolutely no surprise or remorse whatsoever. He simply said, "Mexico doesn't sound bad this time of year." *Id* at 721.

    The fact that McAllister later told people that he, alone, was responsible for the murders does not negate petitioner's culpability given the facts developed at trial. Likewise, the fact that Dominguez could have testified to petitioner's prior consistent statements pertaining to the details of the murders, as well as his emotional state while recounting those details, would not have changed his participation in the crimes. Furthermore, any attempt to show how proactive petitioner had been with respect to "dozens"[2] of McAllister's prior violent outbursts towards other people (including strangers) would have clearly demonstrated that

_____

    [2]  Respondent's Exhibit 121, p. 2.

    17 - OPINION AND ORDER

petitioner: (1) was capable of doing much more to save Goza and Nimz had he wished to do so; and (2) was well aware of McAllister's tendency to act upon his violent impulses, something petitioner not only knew when he went with him to the beach on June 14, 1997 for the stated reason to kill someone, but also something he obviously knew when he purchased the "street sweeper" firearm for him.

For these reasons, the testimony petitioner believes counsel should have elicited at trial would not have made any difference in the trial's outcome.  Accordingly, upon an independent review of the record, the court finds that the state court decision regarding petitioner's ineffective assistance of counsel claims to be neither contrary to, nor unreasonable applications of, clearly established federal law.

<u>**CONCLUSION**</u>

For the reasons identified above, the Corrected Amended Petition for Writ of Habeas Corpus (#37) is DENIED.

IT IS SO ORDERED.

DATED this ___22___ day of January, 2009.


 /s/Michael W. Mosman
        Michael W. Mosman
        United States District Judge

18 - OPINION AND ORDER